IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| JAMES E. KELLER, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 3:07CV433-HEH |
| | ) |
| RYAN W. HOOD, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION
(Granting Defendant's Motion for Summary Judgment)

This is a civil rights suit originating from a police officer's use of force. It is currently before the Court on Defendant Ryan W. Hood's Motion for Summary Judgment filed on January 2, 2008. Both parties have filed memoranda of law in support of their respective positions. The Court heard oral argument on February 19, 2008. Finding that Defendant is entitled to qualified immunity, the Court will grant his Motion for Summary Judgment.

The events leading Plaintiff James E. Keller to initiate this civil action occurred on the morning of September 6, 2005. Members of Keller's family called police to report that Keller was in a troublesome mental state and requested assistance. Keller's family informed police that he had not been taking his medication, was acting erratically, and that he believed the rapture had occurred. Keller's family had attempted to take him to the hospital but he refused. In addition to calling police, the Keller family called Pastor Robert Warnick and informed him that Keller was suicidal.

Defendant Ryan Hood was serving at the time as a Sergeant in the Town of Colonial Beach Police Department and was on-duty when the Keller family requested police assistance. Hood was familiar with Keller from two prior calls. On one occasion, Hood arrested Keller for domestic violence. He had also previously responded to a call claiming Keller was missing. In that instance, he had found Keller on the pier at Colonial Beach alone and depressed. As a result of these prior interactions, Hood knew Keller suffered from mental health issues and that he could be unstable and sometimes violent. On the morning of September 6, 2005, Hood responded to the Keller family's call and eventually located Keller on the banks of the Potomac River. Keller fled into the river when Hood approached him.

After Keller entered the water, the incident began to escalate. Several other law enforcement officers and rescue personnel responded to the scene. Present were Chief Courtland Turner and other officers from the Colonial Beach Police Department, James Carlson, a deputy sheriff from Charles County, Maryland which borders the Potomac River opposite Colonial Beach, and Kelly Ehrlich, an emergency medical technician. Both the Colonial Beach Volunteer Fire Department and the Charles County Sheriff's Office launched boats to help retrieve Keller from the river. Members of Keller's family and Pastor Warnick also arrived on the scene.

Keller ultimately remained in the Potomac River for approximately two hours. During that time his behavior was erratic. He was often aggressive and angry. When Hood approached Keller utilizing the fire department's boat, Keller told Hood he was evil

and threatened to kill him. Keller was intermittently screaming while in the water and at times struck the boats with his fists as they neared him. He also punched the water with closed fists. Hood returned to shore and, after discussion with other officers on the scene, attempted to employ a Taser to help officers gain control of Keller.[1] Hood, standing on the shoreline, fired the Taser at Keller while he was still in the water but did not strike him.

While still in the water, Keller declared that he was going to walk to the U.S. Supreme Court in Washington. Pastor Warnick and Deputy Carlson eventually calmed him somewhat and convinced him that he should exit the water and they would give him a ride to Washington. Keller exited the water, but quickly decided that he wanted to get a case of beer rather than go to the Supreme Court. It is undisputed that after Keller exited the water and began walking from the river, there was an altercation with officers. Hood shot Keller with the Taser during this altercation. After he received the jolt of electricity from the Taser, Keller fell to the ground and struck his head. He suffered serious injuries as a result and believes that the use of the Taser by Hood was a violation of his Fourth Amendment right to be free from unreasonable seizure. Keller filed this civil action on July 23, 2007. In Count I of his Complaint, Keller claims that he was assaulted by Hood,

---

[1] The Taser X26 is an electronic control device carried by law enforcement personnel. "The Taser X26 uses a replaceable cartridge containing compressed nitrogen to deploy two small probes that are attached to the Taser X26 by insulated conductive wires with a maximum length of 35 feet (10.6 meters). The TASER X26 transmits electrical pulses along the wires and into the body affecting the sensory and motor functions of the peripheral nervous system. The energy can penetrate up to two cumulative inches of clothing, or one inch per probe."
http://www.taser.com/products/law/Pages/TASERX26.aspx

Count II claims battery by Hood, and Count III claims he suffered a deprivation of his civil rights by Hood while Hood was acting under color of state law in violation of 42 U.S.C. § 1983. Hood believes that he is entitled to qualified immunity on these claims and has moved for summary judgment.

"Police officers performing a discretionary function enjoy an immunity that shields them from liability for civil damages unless the officer's conduct violates a federal statutory or constitutional right, and the right was clearly established at the time of the conduct, such that an objectively reasonable officer would have understood that the conduct violated this right." *Milstead v. Kibler*, 243 F.3d 157, 161 (4th Cir. 2001) (clause numbering removed). A defendant raising the affirmative defense of qualified immunity must first establish that he was acting within the scope of his official duties. *In re Allen*, 106 F.3d 582, 593-94 (4th Cir. 1997). There is no dispute that Hood was acting within the scope of his duties as a Colonial Beach Police Officer when he Tasered Keller. The Court's first inquiry, therefore, is whether, viewing the facts in the light most favorable to the plaintiff, a constitutional violation has occurred. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The "plaintiff carries the burden of showing that the defendant's alleged conduct violated the law." *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993).

Once a violation of the Constitution has been established, the Court determines whether the right violated was clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201-02. The "answer to both *Saucier* questions must be in the affirmative in

order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003).[2]

Keller claims that Hood's use of the Taser was not warranted and amounts to an unreasonable seizure in violation of the Fourth Amendment. The Court's first duty at this stage is to determine whether the facts, when viewed in Keller's favor, show that Hood used excessive force and therefore violated his constitutional rights. "[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

The essential question here is whether Hood's employment of the Taser was reasonable under the "totality of the circumstances." *Tenn. v. Garner*, 471 U.S. 1, 8-9 (1985). Assessing the reasonableness of an officer's use of force "requires careful attention to the facts and circumstances of each particular case, including . . . whether the suspect poses an immediate threat to the safety of the officers or others, [or] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Further, the Court must examine the facts "through the lens of the officer's perceptions at the time of the incident in question," and limit "second-guessing the

---

[2]In conducting the *Saucier* analysis, the Court is mindful that qualified immunity is not merely a defense to liability but an immunity from suit, and that "[o]ne of the purposes of immunity . . . is to spare a defendant . . . unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 233 (1991); *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998).

reasonableness of actions with the benefit of 20/20 hindsight." *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994).

There is a substantial factual record from which the Court can assess the reasonableness of Hood's use of force. Not only were several police officers, rescue personnel, and members of Keller's family present on the banks of the Potomac River by the time Hood employed the Taser, but these matters were also previously litigated in a criminal trial.[3] The record before the Court consists of the observations of Hood and several witnesses present that day as relayed through depositions, before the grand jury, and at the previous criminal trial. The picture of what happened in the moments leading up to the employment of the Taser against Keller is nonetheless somewhat convoluted, so determining whether Hood used excessive force requires the Court to parse the record carefully.

All present agree that Keller was behaving erratically and at times violently in the river for approximately two hours, and that Pastor Warwick and Deputy Carlson coaxed him out of the river by offering to drive him to the Supreme Court in Washington. The pastor was walking side by side with Keller as he left the river and walked on the nearby road, but was led away from him by EMT Ehrlich within a few seconds of exiting the water. Ehrlich led the pastor away because she felt that some confrontation between law enforcement officers and Keller was inevitable based on Keller's prior conduct, and she

---

[3]Hood was acquitted at trial of conspiracy to deprive Keller of his civil rights, deprivation of Keller's civil rights, and six other charges. *See* Criminal No. 3:06CR520-JRS.

did not want Warwick caught in the scuffle. (Ehrlich CT, pp. 451-52.) Ehrlich believed that Keller "clearly wasn't going to go either with law enforcement peaceably or with me peaceably." *Id.*

According to Hood, after Keller left the water he personally ordered him to stop two times, but Keller continued to walk along the road now focused on obtaining beer rather than reaching the Supreme Court. (Hood CT, p. 1038.) Hood testified that Keller responded to his command to stop by saying "I'm not going anywhere with you. I'm going to get beer." *Id.* Hood continued to approach Keller and Keller then "spun around" in the roadway facing Hood. *Id.* Hood recalls that once Keller turned around he raised his arms, he balled his fists, he assumed a partially "bladed" stance, he made a noise that sounded "like a growl," and he had a "look of anger on his face." *Id.* at 1039. Hood "felt very threatened" and fired the Taser at Keller. *Id.* The Taser probes struck Keller and the ensuing electric pulses caused him to fall backward to the ground. Keller fractured his skull and suffered brain trauma that has left him with long-term injuries.

Chief Turner's and Deputy Carlson's perceptions of the events immediately preceding use of the Taser closely mirror Hood's impressions. Turner heard Hood give Keller two commands to stop. (Turner Dep., p. 8.) He then observed Keller turn while making "a guttural sound" and "bringing his hands up." *Id.* Turner saw Keller ball his fists and "observed the muscles across the shoulders and back tense." *Id.* Turner concluded that Keller was "going to do something, that he was . . . going to exhibit some violent behavior," and that Keller "was an immediate threat to whoever was there."

(Turner Dep., p. 9; Turner CT, p. 893.) Turner believed that "someone was going to be hurt by Mr. Keller" and was preparing to restrain him personally by force when Keller was hit with the Taser by Hood, the only officer on the scene trained to carry the Taser. *Id.* at 894.

Deputy Carlson testified that Keller appeared to be cooperative as he neared the shoreline, but as Keller was exiting the water he began to change his mind and wanted a case of beer. (Carlson CT, pp. 646-47.) Carlson was 20 to 30 feet from Keller as he exited the water and he asked him to stop and sit down repeatedly as they walked towards the adjacent road, but Keller did not comply. *Id.* at 647-48. As Keller continued to walk, his "demeanor changed," he "became more defiant," and he got "jumpy and jittery." *Id.* Every time Carlson moved towards Keller, he would move away and continue walking. *Id.* at 649. Keller then "suddenly stopped walking." *Id.* According to Carlson, Keller balled his fists, tensed the muscles in his arms, and assumed "an aggressive stance." *Id.* at 650. Carlson thought at this point that Keller had taken "an aggressive posture" and "was ready to attack." *Id.* When asked whether Hood's use of the Taser was appropriate based on his observations, he concluded that Keller "was in the beginning stages of an attack. I don't see that it was unreasonable for the Taser to have been deployed at that point." *Id.* Carlson believed it was approximately a minute between when Keller exited the water and when Hood employed the Taser, and that he was personally giving commands to Keller to stop and sit down during that entire period of time. *Id.* at 662.

The accounts of other witnesses are not fully congruent with the recollections of Sergeant Hood, Chief Taylor, and Deputy Carlson. Ehrlich does not recall Hood giving Keller any warnings or commands before firing the Taser but also says she "wasn't paying attention to Officer Hood."[4] (Ehrlich CT, p. 454.) However, Ehrlich does remember Keller saying "I'm not going to stop for nobody" before Hood used the Taser. When Ehrlich later transported Keller to the hospital, after he was shot with the Taser, he was combative and assaulted her as soon as he was let out of his restraints. *Id.* at 477.

FBI Special Agent Bruce Hough interviewed Hood as part of the investigation that led to criminal charges against him. Keller emphasizes a portion of Hough's testimony during the criminal trial in which he says that Hood told him he "did not give any commands right before he shot [Keller]." (Hough CT, p. 543.) However, later in his testimony Hough says that Hood always claimed he gave Keller one or two commands to stop, but those commands were not given "right before" he discharged the Taser. *Id.* at 575-76.

Pastor Robert Warnick coaxed Keller out of the water. He walked by Keller's side until he was led away by Ehrlich just before the confrontation between Keller and Hood. Warnick does not recall hearing Hood give Keller any commands to stop before the Taser

---

[4]Ehrlich admits that Hood pressured her to file a report that would favor his account of the events. That episode, as well as allegations that Hood may have altered a fellow officer's report to make it clear that Keller was combative, prompted the United States to prosecute Hood for obstruction of justice. Hood was acquitted of those charges, however, and Ehrlich has largely stood by her report in prior testimony. The Court is confident that in evaluating Hood's motion it is relying on evidence that is both reliable and credible.

shot. (Warnick CT, pp. 421-22.) He does acknowledge in his testimony, however, that he knew Keller could not have been permitted to leave the scene without receiving medical attention and that some confrontation between Keller and police officers was inevitable. *Id.* at 427, 431. He also provided testimony that Keller oscillated from violently beating his fists in the water and screaming to being calm throughout the day without any logical explanation. Warnick believed he was assuming some risk by walking closely with Keller away from the water because another aggressive event was possible. *Id.* at 427-28.

The recollections of Keller's family members present by the river of the events immediately preceding the use of the Taser contradict Hood, Turner, and Carlson's portrayal. Sharon Keller, James Keller's sister, testified previously that Keller was in no physical condition to resist being taken into custody and that officers gave no commands to him before utilizing the Taser. (Sharon Keller GJ, p. 10.) She claims that Keller was "unstable . . . and wobbling" when he turned towards Hood, and his hands were partially open rather than in fists because James Keller is not able to fully open his hands. (Sharon Keller Dep., p. 29; Sharon Keller CT, pp. 257, 276.) Edith Keller testified similarly. Her recollection is that an officer told Keller to "put your hands up" after he exited the water. (Edith Keller CT, p. 235.) She claims that Keller was not resisting but rather turned and raised his hands and that his hands were not all the way closed into fists. *Id.* at 235-36. Neither relative believes that Keller posed a threat when he turned towards officers.

Reviewing all of the evidence collectively, even in the light most favorable to the plaintiff, it is apparent that Hood's decision to Taser Keller was reasonable as a matter of law despite the narrative provided by Keller's family members. Hood arrived on the scene having observed Keller unstable and violent in the past. It is undisputed that Keller was behaving erratically throughout the incident and exhibited violent behavior during the two hours he was in the Potomac River. He was screaming and punching both the water and rescue boats with his fists. All present, including Keller's family, believed that Keller could not be allowed to leave the scene on his own and needed to be taken into custody and transported to the hospital. Both Ehrlich and Pastor Warnick fully expected some confrontation between police and Keller as he attempted to leave the scene to obtain beer.

Hood's perception that Keller posed a threat to himself and others when he turned and appeared to ball his fists was shared by at least two other experienced law enforcement officers present. Both Chief Turner and Deputy Carlson observed Keller from close proximity. Chief Turner believed Keller represented an "immediate threat" at that moment and was preparing to engage him physically when Hood utilized the Taser. By the time Keller exited the water, Hood knew (1) that Keller was unstable, (2) that Keller had reacted violently to authorities while in the Potomac, (3) that Keller had threatened to kill him, and (4) that Keller did not appear inclined to submit to officers after exiting the water but was, instead, focused on getting beer. When Keller then spun towards Hood and raised his fists, it was objectively reasonable, in the moment or two

11

that Hood had to act, for him to believe that Keller intended to fight the officers. Reasonably believing that Keller posed a threat, it was appropriate to shoot Keller with the Taser.

In retrospect, Hood may have misinterpreted Keller's intentions and misjudged the risk of violence posed. Keller's fists may not have been balled and prepared to strike but merely partially closed as his family contends. But whether Hood's heat of the moment assessment of Keller's intent was right or wrong is largely irrelevant to the analysis. What is dispositive is the reasonableness of his perceived need to utilize force. *See Sigman*, 161 F.3d at 788 (holding whether officer correctly perceived suspect had a knife when he shot him was "immaterial" since decision to fire was reasonable under the circumstances); *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) (holding use of force against an unarmed suspect was reasonable since officer had probable cause to believe suspect posed deadly threat). Given the totality of the circumstances facing Hood, the Court finds that a reasonable officer on the scene could have perceived that Keller represented a threat and further finds that utilizing a Taser to counter that perceived threat was a reasonable countermeasure.

Keller points to the conflicting accounts of the moments preceding the use of the Taser and insists they create a genuine issue of material fact that would render summary judgment inappropriate. In identifying the <u>material</u> facts, the Court must focus narrowly on those specific events and impressions which animated the officer's judgment. In that respect, the actual accounts on the record do not vary that widely. It is undisputed that

12

Keller had a history of violence and instability and was combative while in the river. It is undisputed that he exited the river and seemed intent on leaving the banks of the Potomac to obtain beer. It is undisputed that Keller turned and faced officers with his hands raised when they attempted to stop him from leaving. The purported dispute merely centers around whether Keller defied commands to halt before being Tasered, whether his fists were clenched, as opposed to partially closed when he turned, and whether his stance was properly characterized as aggressive.

As the Fourth Circuit has noted in multiple excessive force cases, "it will nearly always be the case that witnesses . . . differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact." *Gooden v. Howard County*, 954 F.2d 960, 965 (4th Cir. 1992). The relevant inquiry is "whether the officers acted reasonably upon the reports *available to them* and whether *they* undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances *they faced*." *Sigman*, 161 F.3d at 786 (emphasis in original).

In the final analysis, the officer's perception, if reasonable, governs. The consistency between the testimony of Sergeant Hood, Chief Taylor, and Deputy Carlson, supports the reasonableness of Hood's perceptions. As the Supreme Court noted in *Graham v. Connor*, 490 U.S. 386 (1989), law enforcement officers are often called upon to make "split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving . . . ." *Id.* at 397.

Hood was confronted with a tough judgment call. Even when viewed in the light most favorable to Plaintiff, the result of Hood's decision may have been regrettable, but his rationale was objectively reasonable. That is all the law requires to entitle him to qualified immunity, which protects him from liability for "bad guesses in grey areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Plaintiff's evidence fails to demonstrate a Fourth Amendment violation.

The defendant is therefore entitled to qualified immunity, and his Motion for Summary Judgment will be granted.

An appropriate Order will accompany this Memorandum Opinion.

                                                                 /s/
                                            Henry E. Hudson
                                            United States District Judge

ENTERED this 5th day of March, 2008.
Richmond, VA